UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                        :

VINCENT FALCO,

        Plaintiff,

    - against -                     **<u>COMPLAINT</u>**

DIGITAL CURRENCY GROUP, INC., BARRY     JURY TRIAL DEMANDED
SILBERT, and SOICHIRO "MICHAEL" MORO,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I.    INTRODUCTION

1.    Like many cryptocurrency companies during the now infamous "crypto winter" over the Summer of 2022, Digital Currency Group ("DCG") and its subsidiaries suffered tremendous losses. One of the subsidiaries hit particularly hard was Genesis Global Capital LLC ("Genesis Global" or "Genesis"). Instead of addressing these losses in an open and honest manner, DCG, its CEO, Barry Silbert ("Silbert"), and Genesis Global's CEO, Soichiro "Michael" Moro ("Moro"), deceived and defrauded thousands of investors and potential investors about the financial situation at DCG and its affiliates in the second half of 2022. DCG, Silbert, and Moro relied on DCG's reputation in the cryptocurrency industry to orchestrate a fraudulent public campaign to induce these investors to loan cryptocurrency assets to Genesis Global, which was badly undercollateralized and financially unstable at the time.

2.    Plaintiff Vincent Falco ("Falco") was one of the individuals who was fraudulently induced into loaning a substantial amount of bitcoin to a company that was in its death throes,

unbeknownst to him. Falco was aware of DCG's purported reputation in the cryptocurrency industry through articles in industry publications, including CoinDesk (which was owned by DCG), and tweets that DCG, Silbert, and Moro disseminated as part of their public misinformation campaign. Falco also relied on statements made to him directly by Genesis Global representatives who parroted false talking points and misrepresentations that were drafted, approved, and distributed to Genesis Global personnel by DCG, Silbert, and Moro.

3.      For instance, at a time that Genesis Global was essentially insolvent, a Genesis Global representative—repeating DCG, Silbert, and Moro's false talking points—told Falco that DCG had "assum[ed]" over $1 billion of a liability Genesis Global had incurred when a major counterparty defaulted on large loans Genesis Global made to it, using its own lenders' cryptocurrency assets:

| | | |
|---|---|---|
| **VF** | **Vinnie Falco** | 07:03 |
| | up to 2,000 BTC maybe | |
| | What is Genesis' exposure to Three Arrows? | 07:03 |
| **H** | **H** | 07:06 |
| | hey @vinniefalco happy to jump on the phone and give you the play by play but we are past the TAC situation. We've managed through that with DCG assuming the liability back in June. | |
| **VF** | **Vinnie Falco** | 07:06 |
| | Oh, great | |

4.      DCG did not "assume" that liability. Instead, DCG, Silbert, and Moro orchestrated a scheme by which DCG gave an illiquid promissory note to Genesis Global in exchange for the callable assets that Genesis Global loaned to the counterparty. Despite knowing that the promissory note did nothing to shore up Genesis Global's finances, DCG, Silbert, and Moro

publicly portrayed this accounting gimmick as an infusion of $1 billion worth of immediately liquid capital into Genesis Global. Genesis Global personnel then repeated these false characterizations to lenders and potential lenders in a vain bid to obtain their cryptocurrency to fend off Genesis Global's impending demise.

5.    Falco reasonably relied on these lies to extend an enormous loan of bitcoin to Genesis Global. When the inevitable to DCG (but unthinkable to Falco) occurred and Genesis Global filed for bankruptcy, Falco's bitcoin became property of Genesis Global's estate. Because the Genesis Global estate has not recovered nearly enough to make Falco whole, Falco is still out a significant amount of the bitcoin he loaned to Genesis Global, and he seeks to recover the bitcoin the Defendants fraudulently took from him.

## II.    PARTIES

### A.    Plaintiff

6.    Plaintiff Vincent Falco, a California resident, has been involved in the cryptocurrency industry for well over a decade. Falco opened an account with Genesis Global to support his nonprofit organization, C++ Alliance, and later opened his own account for his personal investment purposes. Falco made two loans to Genesis Global, one in March 2021 and the second in October 2022, at a time when DCG affiliate Genesis Global was effectively not solvent, but Defendants represented to Falco that it was. Genesis Global obtained the October 2022 loan from Falco under false pretenses and fraudulent omissions based on statements that were made, drafted, and approved by Defendants. Through the Genesis Global bankruptcy, Falco was able to obtain a portion of the principal and interest he was owed under the October 2022 term sheet, but his second loan is largely unrecovered.

**B.    Defendants**

7.    Defendant Digital Currency Group, Inc. is a well-established venture capital corporation that operates companies in the cryptocurrency industry. Founded in 2012, DCG is formed and existing under and pursuant to the laws of Delaware. DCG maintained its principal place of business in New York, New York, before announcing in November 2021 that it would be moving to new headquarters to be completed in summer 2022 in Stamford, Connecticut, where it is currently located. DCG operates as a conglomerate with a number of wholly owned subsidiaries. Relevant here, DCG owns 100% of Genesis Global Holdco ("Holdco"), which owns and is the sole managing member of Genesis Global. DCG also owns 100% of Genesis Global Trading, Inc. ("GGT").

8.    Defendant Barry Silbert is the founder and the CEO of DCG, and chair of DCG's board of directors. Upon information and belief, Silbert was a resident of Connecticut and is currently a resident of Westchester County, New York. Silbert worked from DCG's offices in Connecticut, as well as from the offices of DCG affiliate Genesis Global at 250 Park Avenue South, in New York County, New York. Silbert reportedly owns 40% of the equity of DCG. Silbert has consistent and daily management responsibilities for DCG's and DCG's subsidiaries' operations, including Genesis Global. Silbert has repeatedly and publicly discussed his role in DCG and active oversight of its wholly-owned subsidiaries.

9.    Defendant Soichiro "Michael" Moro was the CEO of Genesis Global beginning in February 2018, and served as COO of GGT beginning in April 2015, and CEO of GGT starting in March 2016. Moro was responsible for all operations and management at GGT, which, under his leadership, grew to over $25 billion in annual trades, loans, and transactions, and expanded from OTC trading into institutional borrowing, lending, derivatives, custody, and prime brokerage

services. Moro was terminated in August 2022. At all relevant times, Moro worked from and resided in New York.

## III.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the parties and the matter in controversy exceeds the sum of $75,000.

11.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District.

## IV.    PLAINTIFF'S LENDING RELATIONSHIP WITH DCG's AFFILIATE[1]

### A.    The Loan Program

12.    DCG was founded in 2015 by Defendant Sibert, who aimed to build the largest "investment portfolio in the digital currency and blockchain ecosystem."[2] Silbert successfully assembled and ran a broad network of crypto investments worldwide.[3] DCG described itself as sitting "at the epicenter of the industry, backing more than 175 blockchain-related companies in over 35 countries."[4] By the end of 2021, DGC had "invested in more than 200 blockchain

---

[1] Plaintiff alleges the following against Defendants based upon the investigation of Plaintiff's counsel and information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of publicly available information concerning Defendants, including information based on the pleading and filings in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), *SEC v. Genesis Global Capital, LLC., et al.*, No. 23-cv-00287 (S.D.N.Y.); *Picha et al. v. Gemini Trust Company, LLC, et al.*, No. 22-cv-10922-NRB (S.D.N.Y.); *Gemini Trust Company, LLC v. Digital Currency Group, Inc. and Barry Silbert*, 23-CV-6864-LJL (S.D.N.Y.); *The People of the State of New York v. Genesis Global Capital, LLC, et al.*, Index No. 452784/2023 (Sup. Ct. N.Y.) (filed Oct. 19, 2023); and *United States v. Samuel Bankman-Fried*, 22cr673 (LAK) (S.D.N.Y.). Plaintiff believes substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.
[2] Fitz Tepper, *Barry Silbert Launches Digital Currency Group with Funding from MasterCard, Others*, TechCrunch (Oct. 27, 2015 4:02 PM ET), https://techcrunch.com/2015/10/27/barry-silbert-launches-digital-currency-group-with-funding-from-mastercard-others/.
[3] *Id.*
[4] *Digital Currency Group Announces Plan to Increase Purchase of Shares of Grayscale Bitcoin Trust (OTCQX: GBTC)*, businesswire (Oct. 20, 2021 8:30 AM ET),

companies" and was the parent company to Grayscale Investments, "the world's largest digital currency asset manager."[5] That success led to public recognition, including Silbert being listed first on a 2021 list of the "top 21 crypto leaders."[6] Silbert reportedly wanted his company to be the twenty-first century's version of Standard Oil, the oil conglomerate founded by John D. Rockefeller.[7]

13.    DCG was also an early investor in Coinbase, one of the world's largest cryptocurrency exchanges. DCG had investments in the hardware wallet company Ledger and the cryptocurrency company Ripple. DCG even bought CoinDesk, which is one of the largest news outlets for the cryptocurrency industry.[8]

14.    DCG was among the most valuable cryptocurrency companies in the industry—at one point worth over $10 billion—and boasted significant and reputable investors, including an Alphabet affiliate, SoftBank, and Ribbit Capital.[9] DCG and its subsidiaries represented themselves as "the most recognized, innovative, and active participants in the digital currency and blockchain industry" and "backed by some of the world's most prominent investors."[10]

15.    DCG operated a conglomeration of companies, including Genesis Global, and offered a number of financial products to institutional and individual cryptocurrency investors. In

---

https://www.businesswire.com/news/home/20211020005366/en/Digital-Currency-Group-Announces-Plan-to-Increase-Purchase-of-Shares-of-Grayscale-Bitcoin-Trust-OTCQX-GBTC.

[5] *Digital Currency Group Raises New $600 Million Credit Facility*, businesswire (Nov. 18, 2021 8:00 AM ET), https://www.businesswire.com/news/home/20211118005545/en/.

[6] Zack Guzman, *The Top 21 Crypto Leaders to Watch in the Back Half of 2021*, yahoo!finance (Aug. 2, 2021), https://finance.yahoo.com/news/the-top-21-crypto-leaders-to-watch-in-the-back-half-of-2021-162710063.html.

[7] Paul Vigna, *Digital Currency Group Wants to Be Crypto's Standard Oil*, Wall Street Journal (Nov. 1, 2021 1:10 PM ET), https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-standard-oil-11635764400.

[8] *See* Kevin T. Dugan, *The Crypto World Has a New Villain*, Intelligencer (May 20, 2024), https://nymag.com/intelligencer/article/barry-silbert-is-the-crypto-worlds-new-villain.html.

[9] *See* Kate Rooney, *Grayscale-Parent Digital Currency Group Tops $10 Billion Valuation with SoftBank, Alphabet Investments*, CNBC (Nov. 1, 2021 11:02 AM), https://www.cnbc.com/2021/11/01/digital-currency-group-sees-10-billion-valuation-as-softbank-google-invest.html.

[10] *Digital Currency Group Raises New $600 Million Credit Facility*, businesswire (Nov. 18, 2021), https://www.businesswire.com/news/home/20211118005545/en/.

November 2021, a DCG press release described Genesis Global as "one of the leading institutional trading and lending firms in the world."[11]

16.     Beginning at least as early as July 2020, Genesis Global began offering a lending program to institutional and individual investors that the DCG conglomerate called "Yield Generation" (the "Loan Program"). Through the Loan Program, investors, such as crypto hedge funds and high-net-worth individuals, could loan cryptocurrency to Genesis Global and receive interest at rates that were much higher than those offered by DCG's competitors. Moreover, the interest on the loan was paid to lenders "in-kind," *i.e.*, in the same cryptocurrency as the asset the lender loaned to Genesis Global. These loans could be for either an open term or fixed terms (such as six months or a year).

17.     The Genesis Global website touted its reputation as a safe and secure borrower, highlighting that its Loan Program allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." *Figure A* depicts that portion of the Genesis "Lending" website as it appeared on February 27, 2021.



*Figure A - Genesis "Lending" website portion as it appeared on February 27, 2021*[12]

---

[11] *Id.*
[12] Available at https://web.archive.org/web/20210227175020/https://genesistrading.com/lending/.

18.     The Genesis "Lending" website also prominently featured the DCG logo, as shown in *Figure B*, to take advantage of DCG's reputation and reassure lenders that they were loaning their assets to a safe and reliable titan of the industry.



*Figure B - Genesis "Lending" website as it appeared on February 27, 2021*[13]

19.     Individuals who participated in the Loan Program entered into a standard Master Borrow Agreement ("MBA") with Genesis Global. The specific terms of each individual loan were then specified on a separate "term sheet" each time the individual made a loan to Genesis Global. For example, an individual with an already-existing MBA might loan bitcoin ("bitcoin" or "BTC") for a six-month period at an annualized interest rate of 5%. Relying on DCG and Genesis Global's reputations as safe, reliable, and trustworthy counterparties, Genesis Global did not offer and lenders did not demand collateral or other security for their loans.

20.     Through the MBA, and in particular because of the unsecured nature of the loans, Genesis Global provided representations and warranties about its financial strength and the absence of threats or risks to its solvency (hereinafter referred to the "Solvency Warranty" and "Adverse Proceedings Warranty"). Specifically, Genesis Global's MBA included the following:

> [Genesis Global] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

> [Genesis Global] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

---

[13] *Id.*

**B.    Plaintiff's Relationship with and His First Loan to DCG's Affiliate Genesis Global**

21.    Falco has been involved in the cryptocurrency industry for well over a decade. Falco was introduced to the industry in approximately 2011 or 2012, when he first read the whitepaper titled "Bitcoin: A Peer-to-Peer Electronic Cash System," which was written by Satoshi Nakamoto (the "Bitcoin Whitepaper").

22.    Falco was drawn to the Bitcoin Whitepaper's description of a decentralized electronic currency, in contrast to the central management of the United States' fiat system. This interest led Falco to begin investing in bitcoin and another cryptocurrency in approximately 2013 or 2014. Falco continued to acquire bitcoin until some point in 2017.

23.    Falco also worked as a computer programmer for the cryptocurrency company Ripple from approximately 2014 to approximately 2017.

24.    In 2017, Falco founded a nonprofit organization called C++ Alliance. The C++ Alliance funds and supports educational resources and initiatives concerning the C++ programming language and helps to evolve C++ by maintaining code libraries.

25.    To fund the C++ Alliance, Falco donated appreciated bitcoin to his charity, which, from time-to-time needed to be converted into U.S. dollars. After learning that Genesis Global's over-the-counter cryptocurrency trading desk that converted bitcoin to dollars could be useful for his nonprofit, Falco opened his first Genesis Global account for the C++ Alliance in 2019.

26.    In around February 2021, Falco learned about the Loan Program through several public online sources. For example, Genesis Global produced a public quarterly production titled "Market Observations."[14] In its 2020 Q4 edition, Genesis Global boasted of a great year with

---

[14] *See Quarterly Reports*, Genesis, https://genesistrading.com/insights/quarterly-reports (last visited Feb. 25, 2025).

"significant growth" and spoke of the continued acceleration of the market's momentum.[15] The report also touted a "significant uptick" in loans to Genesis Global from "ultra-high-net-worth individuals, corporations, traditional hedge funds, and family offices."[16] Towards the end of January 2021, multiple online publications reported Genesis Global's record numbers in the fourth quarter of 2020 and the excitement and opportunity moving forward.[17]

27.    Additionally, DCG is the owner of CoinDesk, one of the most important trade publications in the cryptocurrency industry. Falco was aware that DCG owned CoinDesk, which contributed to his impression of DCG as a safe and reputable cryptocurrency company conglomerate.

28.    Through these and other public sources, Falco was aware of DCG's and Genesis Global's purportedly stellar reputations in the cryptocurrency industry. But he was also aware through his own knowledge and experience that the cryptocurrency industry frequently suffered from scams to cheat investors. Falco relied on DCG's and Genesis Global's reputation in the industry in his decision to participate in the Loan Program.

29.    In around February 2021, Falco was considering ways to earn yield on his bitcoin holdings. The Loan Program was exclusive to institutional and high-net-worth individuals, and Genesis Global would only communicate with potential individual investors who confirmed through a questionnaire on the Genesis "Lending" website that they were "Accredited Investors."

---

[15] Genesis, *Q4 Market Observations* 3 (2021), available at https://info.genesistrading.com/hubfs/quarterly-reports/2020/q4-2020-report.pdf
[16] *Id.*
[17] See, e.g. Sam Reynolds, *Genesis Reports $7.6 Billion in Loan Originations, $8.1 Billion in Trading Volumes in Q4*, Blockworks (Jan. 26, 2021), https://blockworks.co/news/genesis-reports-7-6-billion-in-loan-originations-8-1-billion-in-trading-volumes-in-q4 (last visited Mar. 7, 2025); *Genesis Sees $7.6B in Digital Currency Loan Originations During Q4 2020*, Business Wire (Jan. 26, 2021), https://www.businesswire.com/news/home/20210126005292/en/Genesis-Sees-7.6B-in-Digital-Currency-Loan-Originations-During-Q4-2020 (last visited Mar. 7, 2025); Frank Chaparro, *Genesis Originated $7.6 Billion in Crypto Loans During Q4*, The Block (Jan. 26, 2021), https://www.theblock.co/post/92569/genesis-global-trading-q4-crypto-loans-trades (last visited Mar. 7, 2025).

Genesis Global defined Accredited Investor as follows: "An accredited investor, in the context of a natural person, includes anyone who either earned income that exceeded $200,000 (or $300,000 together with a spouse) in each of the prior two years, and reasonably expects the same for the current year, OR, has a net worth over $1 million, either alone or together with a spouse (excluding the value of the person's primary residence)."

30.    In or around February 2021, Falco submitted an inquiry to Genesis Global using its online form. A Genesis Global representative responded to the inquiry and sent Falco the then-current "rate card," which at the top made clear to investors that Genesis Global was "A Digital Currency Group Company." *Figure C* shows the rate card a Genesis Global representative sent to Falco with the interest rates that Genesis Global offered on loans of various cryptocurrencies as of February 1, 2021.



*Figure C – Rate card sent to Falco by Genesis Global representative in February 2021*

31.     Falco discussed the lending opportunity with a Genesis Global representative during one phone call and then moved the discussion to the messaging platform, Telegram. Telegram offers secure, encrypted messaging to protect users' privacy and sensitive financial information and for these reasons is widely used by participants in the cryptocurrency industry. Falco preferred using Telegram to discuss the potential Genesis Global transaction, rather than either email or telephone conversations, for safety, privacy, and record-keeping reasons.

32.     Falco agreed to execute a Master Borrow Agreement on February 9, 2021. Article VI of Falco's MBA contained the same Solvency Warranty and Adverse Proceeding Warranty that all Loan Program MBAs contained, as described above. Article XXV of the MBA automatically renewed the agreement annually, unless either party terminated the agreement, which neither Falco nor Genesis Global ever did.

33.     Falco also entered into a term sheet and made a loan through the Loan Program on March 21, 2021. The term sheet provided that Falco would lend 250 BTC for a one-year term at an annual interest rate of 4.15% (the same rate on the February 1, 2021 rate card) that was payable in-kind.

34.     Falco had little contact with Genesis Global about the Loan Program from the time he made the loan until it matured on March 21, 2022. Genesis Global continued paying in-kind monthly interest payments on the loan until the maturity date. Falco withdrew his entire account balance a couple of months later in June 2022.

35.     Falco withdrew his holdings with Genesis Global at that time because the broader cryptocurrency industry was in turmoil. The implosion of the cryptocurrency firm Three Arrows Capital ("3AC") in June 2022 would bring with it the now-infamous "crypto winter" of the Summer of 2022.

36.    3AC was a cryptocurrency hedge fund that had invested heavily in a stablecoin called Luna, which was the reserve cryptocurrency asset that pegged the Terra stablecoin to the U.S. dollar. For a number of reasons that are now well known, Terra and Luna eventually collapsed, which led to a chain reaction that depressed the price of a number of other cryptocurrencies, including bitcoin. The collapse caused 3AC to incur enormous losses to the point that it could no longer repay its largest creditors and 3AC was forced to liquidate on June 27, 2022.

37.    The 3AC collapse was one of the largest hedge fund demises in history and brought on the "crypto winter." Numerous cryptocurrency investment firms were also invested in 3AC, and 3AC's inability to repay its investors triggered a wave of bankruptcies throughout the industry.

38.    On June 29, 2022, major news sources, including CoinDesk, reported that 3AC was ordered to liquidate its assets and highlighted the "crisis gripping the cryptocurrency sector."[18]

39.    On that day, concerned about 3AC's collapse and the rapidly declining price of bitcoin, Falco contacted Genesis Global about his loan, saying: "I want to withraw [my bitcoin] ASAP." Genesis Global returned Falco's entire bitcoin account balance to his personal wallet that same day.

C.    **Plaintiff's Second Loan**

40.    Falco made a second loan to Genesis Global in October 2022 after a Genesis Global representative reached out to Falco to induce him to loan his crypto and repeated public and private assurances by Defendants related to Genesis Global's financial stability. Those "assurances" were, in fact, false.

---

[18] Mark Kleinman, *Three Arrows Capital Plunges into Liquidation Amid Cryptocurrency Crisis*, Sky News (June 29, 2022), https://news.sky.com/story/three-arrows-capital-plunges-into-liquidation-amid-cryptocurrency-crisis-12640817 (last visited Mar. 14, 2025); Jamie Crawley, *Three Arrows Capital Liquidation Ordered in British Virgin Islands*, CoinDesk (June 29, 2022), https://www.coindesk.com/business/2022/06/29/three-arrows-capital-liquidation-ordered-in-british-virgin-islands/ (last visited Mar. 14, 2025).

41.     In the time leading up to Falco's second loan, DCG and the various DCG subsidiaries were facing an insolvency crisis of their own and coordinating a public disinformation campaign to hide their financial status and induce their investors—including individual lenders like Falco—to keep their investments with Genesis Global and to loan even more to the company to shore up its financial position.

42.     As explained more fully below, despite public and private false assurances to the contrary, Genesis Global actually had enormous exposure to the collapse of 3AC as DCG had caused its subsidiaries Genesis Asia Pacific Pte. Ltd. ("Genesis Asia") and Genesis Global to loan billions of dollars to 3AC as part of its investment strategy to pay investors in the Loan Program.

43.     Defendants knew that if the truth of their subsidiaries' financial position became public, individual and institutional investors would have cause under their MBAs to demand an immediate return of their loans, effectively causing a "bank run" that DCG and its subsidiaries likely could not survive. Thus, instead of being truthful to the public, Defendants engaged in a coordinated and concerted effort to provide false information to the public and to individual investors about the strength and solvency of DCG and its subsidiaries.

44.     Most egregiously, DCG orchestrated a sham transaction by which it purported to "absorb" Genesis Asia's and Genesis Global's losses—worth over a billion dollars—stemming from the 3AC collapse. Under the scheme, DCG agreed to "replace" the $1.1 billion that 3AC owed, of which Genesis Asia and Genesis Global had the right to immediate repayment, with a $1.1 billion promissory note (the "DCG Note").  This wasn't an infusion of capital; rather, DCG kept hidden from the public and its investors and lenders that the terms of the DCG Note dictated *only* that DCG would repay the principal at an annual rate of 1% *over a period of 10 years*.

45.    Defendants engaged in a public campaign through Twitter and other media to falsely portray the DCG Note as curing the "hole" that 3AC left in Genesis Global's balance sheet. Internal records and communications establish that Defendants were well aware that the DCG Note was an accounting sham that did not "absorb" any liability Genesis Global faced with the ill-fated 3AC loans and that Genesis Global was still essentially insolvent as a result of its exposure to 3AC.

46.    Defendants repeatedly made these false representations as part of their campaign to reassure their lenders and keep their cryptocurrency. Defendants also knew they could not keep up the sham forever.  Facing an increasing credit crunch, Defendants purposefully reached out to institutional and individual lenders, including Falco, to obtain additional liquidity to stave off the inevitable—the ultimate collapse of nearly all of DCG's subsidiaries, including Genesis Global.

47.    As part of that scheme, on October 5, 2022, a Genesis Global representative reached out unprompted to Falco through Telegram to solicit a new loan for Genesis Global. The representative's solicitation included: "Hi @vinniefalco hope you're doing well! wanted to share our latest rate card for you below. As you can see we are axed for 6-month tenor for BTC at 5% - wanted to check in to see if you have any BTC to deploy."

48.    The representative also shared a new rate card, which again prominently featured Genesis Global as "A Digital Currency Group Company." The rate card showed that the rate for a six-month term BTC loan was 5%, a higher-than-usual rate that Genesis Global was willing to pay allegedly due to the high demand for six-month term BTC loans.



*Figure D – Genesis Global representative message to Falco via Telegram on October 5, 2022*

49.    The rate card that the Genesis Global representative sent to Falco is below as Figure E.

# Genesis
### A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.25% | 1-month | 1.25% | 1-month | 4.25% |
| 2-month | 1.50% | 2-month | 1.50% | 2-month | 4.75% |
| 3-month | 2.75% | 3-month | 2.75% | 3-month | 5.25% |
| 4-month | 3.50% | 4-month | 3.50% | 4-month | 5.75% |
| 5-month | 4.50% | 5-month | 4.50% | 5-month | 6.25% |
| 6-month | 5.00% | 6-month | 5.00% | 6-month | 6.75% |
| 7-month | 4.75% | 7-month | 4.75% | 7-month | 7.25% |
| 8-month | 4.50% | 8-month | 4.50% | 8-month | 7.75% |
| 9-month | 4.25% | 9-month | 4.25% | 9-month | 8.25% |
| 10-month | 4.00% | 10-month | 4.00% | 10-month | 8.75% |
| 11-month | 3.75% | 11-month | 3.75% | 11-month | 9.25% |
| 12-month | 3.50% | 12-month | 3.50% | 12-month | 9.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of October 3rd, 2022. Genesis borrows unsecured. Rates are subject to change.

*Figure E – Rate card sent to Falco by Genesis Global representative on October 5, 2022*

50.    Falco was intrigued by the solicitation and indicated he would be interested in loaning up to 2,000 BTC. But first he had questions about 3AC and Genesis Global's stability. Having weathered the crypto winter, Falco needed confirmation that DCG and Genesis Global had not suffered losses from the 3AC collapse that might affect their solvency and the return of his loan.

51.    In response to Falco's questions about Genesis Global's exposure to 3AC, a representative referred to as "H" in the Telegram chat responded to reassure Falco that they were "past" the 3AC collapse and that DCG had "absorbed" Genesis Global's exposure to 3AC. As explained in more detail below, DCG's purported assumption of the liability back in June was a reference to the fraudulent DCG Note. Falco unfortunately and unknowingly fell for the lie, responding, "Oh, great."



*Figure F – Genesis Global representative chat with Falco on October 5, 2022*

52.    Wanting to better understand Genesis Global's financial state before committing to the investment, Falco asked for a report showing the state of its finances. A Genesis Global

representative then sent a "lending report" to Falco that purported to show that Genesis Global was

solvent, as seen in *Figure G*.

## Genesis Lending Snapshot as of 10/05/2022

| | Receivable | | Liabilities | | | Loans (-) | | | Sub "B" CP | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Active Loans | Collateral Receivable | Active Deposits | Collateral Payable | Secured | Collat Payable | Unsec Loans | | Secured | |
| All | $2,845 | $1,206 | $5,033 | $1,973 | 0.69x | $872 | $725 | | 1.05x | |
| External | $1,290 | $716 | $4,808 | $1,461 | 1.13x | ($171) | $187 | | 1.05x | |

| External Loan CP # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Loan % Concentration | 23% | 16% | 15% | 13% | 8% | 6% | 3% | 3% | 2% | 2% |
| USD / Stable % of Loans | 70% | 0% | 9% | 0% | 100% | 0% | 0% | 0% | 0% | 0% |
| USDT % of Loans | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 85% | 0% |
| Crypto % of Loans | 30% | 100% | 91% | 100% | 0% | 100% | 100% | 100% | 15% | 100% |
| | | | | | | | | | | |
| Collat % of Total Collateral | 28% | 22% | 14% | 14% | 0% | 5% | 0% | 3% | 2% | 3% |
| USD / Stables % of Collat | 0% | 0% | 0% | 91% | NA | 100% | NA | 0% | 100% | 0% |
| USDT % of Collat | 0% | 73% | 0% | 0% | NA | 0% | NA | 0% | 0% | 0% |
| Crypto % of Collat | 100% | 27% | 100% | 9% | NA | 0% | NA | 100% | 0% | 100% |

| Liquidity | | | | Weighed Avg | | | | Weighed Avg | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Duration | Rating | | | Duration | Rating |
| USD / Stables | $700 | | | | | | BTC | 10.1 | 4.0 |
| BTC | $465 | | Total | 33.2 | 4.7 | | ETH | 16.9 | 6.6 |
| ETH | $267 | | USD / Stable | 72.2 | 4.2 | | Alt | 13.1 | 5.4 |
| Liquidity from Majors | $1,431 | | USDT | 32.5 | 3.9 | | | | |

| | Current | Receivable | | Liabilities | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Assets | Loans | Collat Rec | Borrows | Collat Pay | | | | | |
| Total | $3,104 | $2,845 | $1,206 | $5,033 | $1,973 | | | | | |
| USD / Stables | 571 | 921 | 151 | 1,885 | 786 | | | | | |
| USDT | 128 | 69 | 0 | 547 | 238 | | | | | |
| BTC | 465 | 1,034 | 229 | 1,493 | 267 | | | | | |
| ETH | 267 | 466 | 267 | 716 | 263 | | | | | |
| Other Assets | 1,673 | 355 | 559 | 391 | 419 | | | | | |
| | | | | | | | | | | |
| Assets | $7,155 | Liabilities | $7,005 | Equity | $150 | | | | | |

*approximate calculation of equity across all lending entities

*Figure G - Lending Report sent by Genesis Global representative on October 5, 2022*

53.    The lending report misleadingly supported the false representation that Genesis

Global was not facing a solvency crisis, by purporting to show that Genesis Global's assets

exceeded its liabilities by $150 million.

54.     Falco also asked whether Genesis Global was typically overcollateralized. While the representative acknowledged that Genesis Global extended unsecured credit to counterparties, the representative also falsely indicated that Genesis Global had "derisked" its lending book since May, *i.e.*, since the time of 3AC's collapse. The representative also falsely stated that most of Genesis Global's uncollateralized loans were made to DCG (which the representative portrayed as "internal[]" to Genesis) and the trading desk, as seen in *Figure H*.



*Figure H – Genesis Global representative chat with Falco via Telegram on October 5, 2022*

55.     Falco relied on this information in his decision to lend to Genesis Global. Falco was reassured by the lending report's representation that Genesis Global was solvent.

56.     These reassurances were all the more important given the status of the cryptocurrency industry at that moment in time. After 3AC's bankruptcy, the cryptocurrency industry sustained a significant period of enormous losses and the sudden and unexpected collapse of multiple firms.

57.     Based on these assurances, Falco decided to complete the loan and executed a term sheet on October 5, 2022. Falco loaned Genesis Global 3,000 BTC (worth around $60 million on that day) for a six-month term at an annual interest of 5.00% to be paid in bitcoin.

58.    On November 7, 2022, Falco reached out to a Genesis Global representative, sharing a tweet thread about the then-breaking news of Alameda Research Ltd.'s insolvency and the ongoing bank-run on various FTX entities.[19] Falco was aware that the collapse of FTX could have systemic effects on the entire cryptocurrency industry, much as the collapse of 3AC did just months before.

59.    Concerned about his October 2022 loan, Falco asked the Genesis Global representative about Genesis Global's exposure to FTX. The Genesis Global representative again repeated the lie that Genesis Global was overcollateralized and that 80% of its collateral was denominated in major and stable cryptocurrencies like "BTC," "ETH," "USD," and other stablecoins. The same representative offered to send an updated lending report. Falco responded that he would like to see the updated lending report and was particularly interested in the denomination of Genesis Global's collateral, as seen in *Figure I*.



*Figure I – Genesis Global representative chat with Falco via Telegram on November 7, 2022*

---

[19] The thread can be found here:  https://twitter.com/otteroooo/status/1589556241512116225.

60. The Genesis Global representative provided an updated lending report, as seen in *Figure J.*



### Genesis Lending Snapshot as of 11/07/2022

| | Receivable | | Liabilities | | | Loans (-) | | | Sub "B" CP | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Active Loans | Collateral Receivable | Active Deposits | Collateral Payable | Secured | Collat Payable | Unsec Loans | | Secured | |
| All | $2,489 | $1,173 | $5,432 | $1,747 | 0.70x | $742 | $625 | | 1.13x | |
| External | $1,001 | $738 | $5,283 | $1,176 | 1.18x | ($175) | $83 | | 1.13x | |

| External Loan CP # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Loan % Concentration | 30% | 24% | 20% | 4% | 4% | 2% | 2% | 2% | 2% | 1% |
| USD / Stable % of Loans | 68% | 0% | 8% | 0% | 0% | 0% | 0% | 0% | 0% | 100% |
| USDT % of Loans | 0% | 0% | 0% | 0% | 0% | 86% | 0% | 0% | 0% | 0% |
| Crypto % of Loans | 32% | 100% | 92% | 100% | 100% | 14% | 100% | 100% | 100% | 0% |
| | | | | | | | | | | |
| Collat % of Total Collateral | 33% | 27% | 20% | 0% | 4% | 2% | 2% | 2% | 0% | 2% |
| USD / Stables % of Collat | 0% | 0% | 0% | NA | 0% | 100% | 0% | 100% | NA | 3% |
| USDT % of Collat | 0% | 72% | 0% | NA | 0% | 0% | 0% | 0% | NA | 0% |
| Crypto % of Collat | 100% | 28% | 100% | NA | 100% | 0% | 100% | 0% | NA | 97% |

| Liquidity | | | | Weighed Avg | | | | Weighed Avg | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Duration | Rating | | | Duration | Rating |
| USD / Stables | $311 | | Total | 30.6 | 4.3 | BTC | | 8.8 | 4.0 |
| BTC | $720 | | USD / Stable | 67.8 | 3.7 | ETH | | 13.1 | 6.0 |
| ETH | $663 | | USDT | 13.4 | 3.9 | Alt | | 12.9 | 5.6 |
| Liquidity from Majors | $1,695 | | | | | | | | |

| | Current | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | Assets | Loans | Collat Rec | Borrows | Collat Pay |
| Total | $3,693 | $2,489 | $1,173 | $5,432 | $1,747 |
| USD / Stables | 299 | 808 | 157 | 1,843 | 567 |
| USDT | 12 | 69 | 0 | 361 | 238 |
| BTC | 720 | 1,041 | 237 | 1,782 | 262 |
| ETH | 663 | 377 | 261 | 1,004 | 309 |
| Other Assets | 1,998 | 194 | 518 | 442 | 371 |
| | | | | | |
| Assets | $7,354 | Liabilities | $7,179 | Equity | $175 |

*Approximate consolidated balance sheet across primary lending entities (GGC, GAP, GGCI)*

*Figure J - Lending Report sent by Genesis Global representative on November 7, 2022*

61. As with the October 5, 2022 lending report, these figures were false. Genesis Global could show that its assets were greater than its liabilities *only* because it misleadingly included the DCG Note as an asset on its balance sheet. As explained more fully below, Defendants were well aware that they could not treat the DCG Note as an immediately liquid asset given its ten-year maturity date at a below-market interest rate.

62.     The Genesis Global representative with whom Falco interacted in November 2022 also repeated the same lie that Genesis Global was "oversecured in aggregate against external counterparties" and that the vast majority of Genesis Global's collateral was denominated in major and stable cryptocurrencies. In reality, Genesis Global had hundreds of millions of dollars' worth of outstanding loans that were undercollateralized or else secured by risky cryptocurrencies or illiquid assets.

63.     In the midst of the extreme market volatility caused by the implosion of the FTX empire, Falco was reassured by Genesis Global's false representations that it was solvent and that its loan book was secured by stable collateral. All these representations were false. But in reliance on these false statements, Falco decided to keep his cryptocurrency with Genesis Global. If he knew of the truth, however—that Genesis Global was in fact essentially insolvent and on the verge of filing for bankruptcy—he could have declared Genesis Global to be in breach of the MBA and demanded the immediate return of his outstanding loan balance and all interest he was owed under the Term Sheet.

64.     Every statement made to Falco to induce him to loan bitcoin to Genesis Global, and to keep his cryptocurrency parked at Genesis Global, was materially misleading, deceptive, and false, as detailed herein. In a little over a month after Falco's October loan, Genesis Global suspended redemptions, and two months later filed for bankruptcy. As a general unsecured creditor, Falco has received back just 1,758.54504882 of the 3,000 BTC he loaned to Genesis Global in October 2022, over two and a half years later.

## V.    DEFENDANTS' PUBLIC MISREPRESENTATION CAMPAIGN

65.     Contrary to the fraudulent representations to Falco—which were orchestrated by Defendants—neither DCG nor Genesis Global had worked to "derisk" Genesis Global's balance sheet since May. The 3AC collapse was disastrous for DCG's multitude of subsidiaries, and

DCG's companies desperately needed assets. Even in the throes of the crypto winter, DCG continued to cause Genesis Global to make risky and undercollateralized loans to third parties using the crypto it received from investors. Moreover, after the 3AC collapse, Genesis Global's assets never exceeded its liabilities, and DCG did not "absorb" Genesis Global's losses that resulted from its lending relationship with 3AC. These falsehoods were part and parcel of a monthslong misinformation campaign waged by Defendants and Genesis Global to portray Genesis Global as financially healthy and induce individuals to provide more cryptocurrency through the Loan Program. This misinformation campaign was vital in Defendants' vain effort to keep Genesis Global solvent as its financial condition deteriorated.

### A.    The Collapse of 3AC and Impact on DCG and its Affiliates

66.    In the days leading up to its collapse in June 2022, 3AC was the second largest borrower from DCG's subsidiaries. Although 3AC nominally borrowed from DCG subsidiary Genesis Asia, Genesis Global used Genesis Asia as a pass-through entity to lend its own assets to 3AC. Genesis Asia's loans to 3AC were open-term and callable by Genesis Asia. 3AC paid between 8% and 15% interest on these loans. When Genesis Global funded these loans, it categorized them as "receivables from related parties" on its balance sheet, which reflected the amount that Genesis Global gave to Genesis Asia to lend to 3AC. Genesis Asia repaid Genesis Global around the same time that 3AC repaid its loans to Genesis Asia. For its part, Genesis Asia recorded the amounts it owed to Genesis Global in connection with these loans as "current liabilities" on its balance sheet—*i.e.*, liabilities payable within one year.

67.    On June 13, 2022, 3AC defaulted on billions in loans from Genesis Asia. As a result of this default, Genesis Asia (and thus, the Genesis Global lending business generally) incurred a loss of approximately $1 billion in open-term, on-demand assets.

68.     On June 27, 2022, 3AC was required to liquidate its assets by a British Virgin Islands court following default on several of its liabilities. Subsequently, on July 1, 2022, 3AC sought Chapter 15 bankruptcy protection from the United States Bankruptcy Court for the Southern District of New York. 3AC's bankruptcy filings revealed it had procured billions in loans from Genesis Global. As of July 1, 2022, 3AC was indebted to Genesis Global to the tune of approximately $2.3 billion. Post-liquidation, 3AC's outstanding obligation to Genesis Global was $1.1 billion.

69.     The losses from 3AC created negative equity value at DCG's lending subsidiaries and created a deficit in the open-term assets available to repay Loan Program investors. Genesis Global's internal documents revealed that as a result of the 3AC collapse, Genesis Global's liabilities exceeded its assets by approximately $1.1 billion. In other words, Genesis Global was practically insolvent as of July 2022.

**B.      Public Misstatements About Genesis Global's Solvency and Inconsistent Internal Discussions**

70.     Genesis Global's practical insolvency constituted an "Event of Default" under the terms of the typical Master Borrow Agreement, and specifically Falco's MBA, in at least two ways.

71.     First, under Section VIII(h) of the MBA, an "Event of Default" happens when "any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, [Genesis Global], taken as a whole, or a material adverse effect on the ability of [Genesis Global] to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees."

72.     Genesis Global's practical insolvency certainly constituted a "material adverse effect" on Genesis Global's business and a "material adverse effect" on Genesis Global's ability to repay Falco's loans. Indeed, because of the 3AC default on its loans to Genesis Asia, Genesis Global filed for bankruptcy within months and paused all attempts to withdraw assets any customer had with Genesis Global.

73.     Second, an Event of Default also occurred when "any representation or warranty made by [Genesis Global] in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof." MBA § VIII(j). "Loan Documents" was defined to include any terms sheets entered into between Genesis Global and an investor. MBA § I.

74.     Genesis Global was in breach of the Solvency Warranty because the 3AC default rendered Genesis Global essentially insolvent at that time and through the Petition Date. Genesis Global was also in breach of the Adverse Proceeding Warranty when 3AC filed for liquidation because the pending liquidation proceedings "could reasonably be anticipated to have any adverse effects on the transactions contemplated by [the MBA] or the accuracy of the representations and warranties hereunder." Genesis Global therefore caused an Event of Default when it entered into the October 2022 Term Sheet with Falco.

75.     Defendants were aware that the MBAs provided that in an Event of Default, Genesis Global's thousands of lenders, including Plaintiff, had the right to "declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable" and to terminate the agreement if the Event of Default persisted for 30 days or more. MBA § IX(a).

76.     The 3AC default therefore represented an existential threat, of which Defendants were well aware, to Genesis Global and DCG's other subsidiaries. If lenders like Falco became

spooked and exercised the call option in their agreements, the resulting "run on the bank" would destroy DCG's subsidiaries. Silbert recognized this danger in an internal June 21, 2022, instant messaging thread in which Silbert explained "DCG and Genesis" were in "bunker mode" to hold onto their "precious" liquidity. He also emphasized the necessity that "the trust and confidence in Genesis remains high because we can't risk money leaving Genesis." Part of Silbert's stated strategy was to keep the billion dollar "hole in Genesis equity" due to the 3AC exposure "super confidential," to be shared only with people "in the circle of trust."

77.    Adhering to Silbert's strategy, beginning in mid-June, Defendants began a concerted public relations campaign based on lies and misinformation to portray Genesis Global (and the larger DCG conglomerate) as a safe and stable source of strength prepared to weather the crypto winter. Defendants knew that if this campaign were unsuccessful, and Genesis Global's exposure to 3AC came to light, the DCG conglomerate would likely collapse, which is ultimately what happened.

78.    On June 13, 2022, Silbert directed Moro, the CEO of Genesis Global, and DCG's COO, Mark Murphy, to lead DCG's and its affiliates' response to the 3AC situation "with support and guidance from DCG" and asked that Moro and Genesis Global's COO, Derar Islim, attend a "DCG board update and strategy call" scheduled for the next day.

79.    Moro responded to Silbert by saying: "Derar [Islim] and I are involved every step [sic] of what has been happening . . . We will manage through this with help from you and DCG." Moro reported that these steps included "drafting both internal and external talking points on the [3AC] situation as needs arise."

80.    On June 13, 2022, Silbert reported to DCG's board that 3AC defaulted and that Genesis Global's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well

over $500 mm now)" and that "[t]hings have continued to deteriorate all around," including "the situation with [3AC]," and that as a result, Silbert was expecting a "bank run."

81.     Silbert went on to explain that some of the collateral provided by 3AC was illiquid as it consisted of shares of the Grayscale Bitcoin Trust (known as "GBTC") issued by DCG-subsidiary Grayscale, which Genesis Global could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert informed the board that he was "starting to think about bringing in equity partners directly into Genesis," showing concern for Genesis Global's equity balance sheet, and stating "[e]verything needs to be on the table" regarding financing.

82.     Acknowledging Genesis Global's impending insolvency, Silbert also wrote that DCG's management was "prepping for a bank run on Genesis, which we expect will happen when our [default notice and arbitration] against [3AC] becomes public, if not sooner."

83.     On June 13, 2022, Silbert—continuing his activities in controlling and managing his subsidiaries—wrote to Genesis Global's management team: "Just want to make sure everybody is clear that Genesis [Global] is not to sell th[e] [GBTC] shares or enter into any transaction without consulting with me first."

84.     Also on June 13, 2022, Defendants caused the GGT Twitter account to tweet and Moro to repost that tweet, which falsely represented that Genesis Global has "strong risk management practices and frameworks," as seen in *Figure K*.



*Figure K – Moro reposts tweet on June 13, 2022*[20]

85.     In reality, Genesis Global and Genesis Asia failed to conduct adequate due diligence on 3AC. Contrary to assurances in this tweet, neither Genesis Global nor Genesis Asia had received audited financial statements from 3AC since July 2020. Genesis Global and Genesis Asia also accepted from 3AC illiquid collateral to secure more than $500 million in loans in the form of the GBTC Shares.

86.     And behind the scenes, things were much different than Moro and GGT's June 13, 2022 tweets suggested. Genesis Global's Head of Trading Matthew Ballensweig was "nervous and rattled . . . and [wasn't] entirely thinking straight" according to Moro, who agreed to help Ballensweig "shore up liquidity."

87.     For example, according to sworn testimony and evidence in *U.S. v. Sam Bankman-Fried*, 22 Cr. 673 (S.D.N.Y.) on or around June 13, 2022, Ballensweig—in a Telegram chat with executives from Alameda, including Caroline Ellison—asked Alameda to return hundreds of millions loaned to Alameda by Genesis Global on an open-term basis: "hey, guys - seeing a fair amount of continued outflows from retail deposit aggregators, so to get ahead of this, we're going

---

[20] https://x.com/GenesisTrading/status/1536360521682849792?s=20.

to increase the OT [open term] loan pullback to $400 million. Can you please let us know once the first batch and second batch are sent. Do we have an ETA on the first 250 million?"

88.    That next day, on June 14, 2022, in advance of a strategy call with the DCG board and Genesis Global personnel Moro, Islim, and others, Silbert emailed the DCG board of directors regarding Genesis Global's strategy after the 3AC default. In the email, Silbert presented the option to jettison the Genesis business by not supplying Genesis Global with additional capital to strengthen its balance sheet, an admission that Genesis Global as it currently stood was unable to withstand continued withdrawals because it was practically insolvent. Silbert also set forth two additional options, the first being to "support Genesis" by helping Genesis Global to "stabilize" its balance sheet,[21] and the second being to fire Genesis Global's CEO Moro with Silbert himself replacing him as CEO of Genesis Global, while raising pre-IPO capital to "further strengthen the balance sheet, or down the road once things have stabilized." All three options discussed in this email were premised on the fact that Genesis Global was essentially insolvent and unable to meet its obligations.

89.    On June 15, 2022, Silbert, Moro, Murphy, Ballensweig, and others strategized on how to proceed in a Microsoft Teams chat and agreed that the group needed to prioritize concealing Genesis Global's financial condition from individual and institutional investors, as well as from the public. For example, in that Teams chat, in advance of a call regarding the 3AC default, Moro and Ballensweig agreed to be "very cautious" about revealing Genesis Global's financial condition, due to "concern[] about any leakage of our overall net position."

---

[21] Notably, in the same email, Silbert stated that DCG and its management team, while supporting Genesis Global, would also "at the same time continue to work with counsel to ensure best defenses against veil piercing." Silbert clearly realized that his and DCG's control over Genesis Global, Genesis Global's practical insolvency, and DCG's attempts to provide loans and liquidity to Genesis Global while it was essentially insolvent were all factors indicating that DCG and Silbert were mere alter egos of Genesis Global.

90.     Later in the same Teams chat, Ballensweig shared the "good news" that the rate of redemptions was slowing. Silbert asked in response how "we/DCG" can "further install confidence in Genesis" and stressed the "need to perpetuate" that "Genesis is the 'blue chip' in this mess."

91.     In order to more publicly perpetuate the false notion that Genesis Global was in good financial condition and "blue chip"—consistent with Silbert's instructions—on June 15, 2022, GGT published a tweet that "the Genesis balance sheet is strong" and business is "operating normally," as seen in *Figure L*.



*Figure L – Genesis tweet from June 15, 2022*

92.     Defendants Silbert and DCG, along with Murphy, Ballensweig, and DCG's CFO, Michael Kraines, re-tweeted this statement on June 15, 2022, which falsely represented that Genesis Global's balance sheet was "strong" when at that time it had massive unsecured exposure to 3AC. See *Figure M*. Far from "operating normally," the Defendants knew that Genesis Global was facing a "bank run."



*Figure M – Barry Silbert reposts tweet on June 15, 2022*

93.    To that end, Genesis Global employee Michael Paleokrassas reported in the Teams chat that Genesis Global's false "tweet helped [clients] get comfortable and keep their loans" at Genesis Global.

94.    On June 16, 2022, Moro and a managing director at Genesis Global discussed "how to think about the equity hole on the [Genesis] balance sheet and plan to minimize that." Yet, the next day, as part of Defendants' public misinformation campaign, Moro published a series of tweets supporting the claim that Genesis Global's financial condition was strong, asserting that it had "shed the risk and moved on," as seen in *Figures N and O.*



*Figure N – Moro's tweet on June 17, 2022*[22]



*Figure O – Second Moro tweet on June 17, 2022*[23]

95.    Murphy—DCG's COO—reviewed and edited these tweets before Moro posted them. In strategizing the release of the tweets, Murphy directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Global's compliance department that these tweets should come from Genesis Global's corporate account.

96.    Also on June 17, 2022, Defendant DCG, as well as Kraines and Ballensweig, reposted Moro's misleading twitter thread, to spread this false message even further:

---

[22] https://x.com/michaelmoro/status/1537822426536546306?s=20.

[23] https://x.com/michaelmoro/status/1537822427790680066?s=20.



*Figure P – DCG reposting Moro's tweet on June 17, 2022*



*Figure Q – Kraines reposting Moro's tweet on June 17, 2022*



*Figure R – Ballensweig reposting Moro's tweet on June 17, 2022*

97.    Defendants DCG and Moro's tweets and statements set forth above were false and misleading in at least five ways.

       a.    First, client funds had been impacted—the 3AC losses severely impaired Genesis Global's ability to repay its counterparties, including individual investors like Falco.

       b.    Second, due to 3AC's default on June 13, 2022, Genesis Global's balance sheet was not strong, solvent, or capable of absorbing the losses; Genesis Global suffered

a loss that exceeded its equity. Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us." Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

c. Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

d. Fourth, Genesis Global had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to 3AC as an uncollectible asset on its balance sheet.

e. Fifth, Genesis Global was not operating "business as usual"; the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.

98.    Caroline Ellison, the former CEO of Alameda Research, Inc., testified in Bankman-Fried's criminal trial that Ballensweig told her that Genesis Global was experiencing recalls from its lenders and that she understood that Genesis Global needed Alameda to repay $500 million in loans from Genesis Global or that it "might go under"—directly contradicting Genesis Global's representation that its balance sheet was "strong":

> Q. Can you just explain what you mean by recalls that Genesis was getting on their end.
>
> [Ellison] A. It meant Genesis was——the money that they were lending us, they were borrowing from others, including retail lending platforms, and customers were withdrawing their money from those platforms, so Genesis had to have a way to fulfill those withdrawals, and that's why they needed their money back from us.

Q. This refers to speaking with Sam. What, if anything, did the defendant [Sam Bankman-Fried] tell you about his call with Matt Ballensweig?

[Ellison] A. He told me that he talked to Matt and that Matt said that Genesis really needed the money and implied that they might go under or have to default on some loans if they didn't get it . . . .[24]

99.     Also on June 17, 2022, shortly after Moro published his tweets, Silbert tweeted: "Feels like we have hit max pain and uncertainty in the crypto market[.] We're buying BTC here. Let's go!" Silbert sent this tweet to Genesis Global's management team, including Moro, in an internal Teams chat, after he published it to Twitter.

100.    At the same time as Genesis Global was, in effect, insolvent and facing an "equity hole," starting in June 2022, Silbert and DCG began extracting liquidity from Genesis Global despite Silbert's own acknowledgment of the perilous financial condition Genesis Global was in. On or about June 18, 2022, Genesis Global lent approximately 18,697 BTC (valued at over $355 million as of June 18, 2022) to affiliate DCGI on an open-term basis which *reduced* Genesis Global's liquidity when every communication acknowledged the need to *improve* Genesis Global's liquidity to meet withdrawals.

101.    On June 24, 2022, Silbert reiterated to colleagues that "[w]e just can't allow people inside or outside [to] question Genesis' solvency."

102.    On June 27, 2022, Moro emailed DCG and Genesis Global executives, explaining the need to show a "well-capitalized" balance sheet that "looks strong" to counterparties on June 30, 2022 so that people would "lend us additional [cryptocurrency]."

Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.

And yes, at some point, our losses in [3AC] and potentially Babel will become public. But if we're able to show our balance sheet after all of that happened and it

---

[24] *United States v. Bankman-Fried*, Trial Tr. at 53:5-17 [Docket No. 360]

still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.

But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

103.    In a June 28, 2022, email, Moro wrote to Silbert that he had discussed with other Genesis Global representatives how to "best fill the equity hole," euphemistically referring to the negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Global's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro explained that the assets would not affect Genesis Global's liquidity— it "could just be for balance sheet support" to draw "additional unsecured funding" through unsuspecting lenders:

We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] . . . for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

104.    Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and DCGI teams to figure out all possible ways to do so along the lines" outlined in Moro's email.

### C.    The DCG Note

105.    As detailed above, from mid-June through June 30, 2022, DCG and Genesis Global engaged in a public communications campaign designed to conceal Genesis Global's financial

condition and mislead counterparties into believing Genesis Global was operating "business as usual." These public statements directly contributed to the public's, and Falco's, perception that DCG and Genesis Global remained financially strong and would be a stable place to park large amounts of bitcoin. But the economic reality of Genesis Global's financial condition dictated that Defendants should have caused Genesis Global to declare itself insolvent and either seek recapitalization or restructuring. The myriad internal communications make clear that Defendants were aware that Genesis Global was practically insolvent, yet schemed in ways designed specifically to conceal this fact.

106.    Instead of causing Genesis Global to truthfully admit its essential insolvency, Defendants caused Genesis Global to dubiously maintain that 3AC's $1.1 billion debt to Genesis Global was still worth $1.1 billion and engage in a deceitful financial transaction with DCG and Silbert designed to mislead Genesis Global's counterparties and their agents.

107.    This course of conduct was, according to Silbert, decided upon and executed by himself, DCG, and its board: "***DCG and its board*** determined that it was in the best interest of Genesis [Global], its lenders, and DCG to try to help support Genesis [Global]."

108.    Moro and Silbert entered into the DCG Note on June 30, 2022. Under the DCG Note, DCG agreed to pay Genesis Global a decade later at only 1% interest per annum to "replace" the receivables Genesis Global would have otherwise received from Genesis Asia for the 3AC loans. Genesis Global categorized this $1.1 billion as an asset on its balance sheet.

109.    Silbert signed the DCG Note as CEO of DCG. Moro signed the DCG Note as the CEO of Genesis Global and Holdco, and as director of Genesis Asia. According to DCG, the DCG Note was approved by DCG's board of directors, which includes Silbert.

110.    DCG dictated the terms of the DCG Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the DCG Note. To the contrary, DCG's repayment of the DCG Note was subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the DCG Note.

111.    The DCG Note failed to ensure that Genesis Global had sufficient capital to operate its business. The DCG Note required DCG to provide cash payments in no sooner than 10 years, whereas the 3AC-related liabilities DCG purportedly "assumed" were callable on demand; this created a mismatch between the DCG Note and Genesis Global's billions of dollars' worth of obligations to its individual investors. Genesis Global's and DCG's internal documents reveal that the DCG Note's 10-year duration and 1% interest rate failed to address the "structural hole" caused by the 3AC collapse.

112.    Moreover, the DCG Note was part of a sham transaction whereby Silbert, DCG, and Moro caused Genesis Global to "sell" 3AC's debt to DCG in exchange for the DCG Note, in order to "replace" the receivable on Genesis Global's book. In an internal document, Genesis Global's Chief Risk Officer ("CRO") acknowledged that the DCG Note "wreaks havoc on our balance sheet impacting everything we do." Indeed, this sale could never have occurred between two parties negotiating at arm's length for at least three reasons:

a.  First, the 3AC debt was not worth $1.1 billion at the time, and is not worth $1.1 billion now. The odds of Genesis Global or DCG collecting anything near the full value of the debt were and remain incredibly low, and no party negotiating at arm's length with Genesis Global would have valued the debt at $1.1 billion.

b.  Second, even if the debt *were* worth $1.1 billion, the terms of payment were simply not competitive with the financing terms DCG would have received from a nonrelated party. No party other than a subsidiary completely controlled by Defendants DCG and Silbert would have "sold" a $1.1 billion debt for a 10-year promissory note at 1% interest.

c.  Third, given the first two realities, there is simply no reasonable possibility that the resulting DCG Note is worth anything close to $1.1 billion. As detailed by the President of cryptocurrency platform Gemini in a letter to the Board of DCG seeking to oust Silbert as CEO, given the duration of the note and the underlying economic realities, the "note would be heavily discounted (approximately 70%) to reflect its value as of today (perhaps $300 million)."

**D.  Public Misstatements About the DCG Note and Inconsistent Internal Discussions**

113.  This June 30, 2022 "sale" was how DCG supposedly "absorbed" the enormous losses Genesis Global sustained as a result of DCG subsidiaries' risky lending practices to 3AC. The "sale" however, was a sham. There was no exchange of money and no movement of capital. Defendants knew that these accounting tricks did not "absorb" Genesis Global's losses. But after Silbert executed the DCG Note on June 30, 2022, Defendants caused Genesis Global at the direction of and/or subject to the control of DCG, Silbert, Moro to disseminate misleading and false financial statements to prospective and existing investors.

114.  In furtherance of the Defendants' scheme, from July 2022 through November 2022, Genesis Global sent its counterparties, including individual investors like Falco, reports falsely describing Genesis Global's financial condition. For example, these reports falsely included the DCG Note as an asset that could be reduced to cash within a year. Genesis Global also omitted

explanatory footnotes to its balance sheet because those footnotes would have revealed the DCG

Note's true nature. Genesis Global's CFO and its finance team avoided joining phone calls with

counterparties to conceal Genesis Global's financial condition. Instead, members of Genesis

Global's sales and lending teams answered financial questions using only approved talking points

that contained no explanation of the DCG Note or its terms.

115.    On July 6, 2022, Moro publicly tweeted that DCG "assumed certain liabilities

related to [3AC] to ensure we have the capital to operate":



*Figure S – Moro tweets about the DCG note on July 6, 2022*[25]

116.    DCG executives helped draft and edited these tweets, and Silbert reviewed these

tweets before Moro posted them. DCG thus approved these tweets before they were published.

117.    The tweets were false, misleading, and omitted material facts. DCG did not simply

"assume" the $1.1 billion, open-term liability related to 3AC, which could be called at any time;

it *replaced* that liability with the illiquid ten-year DCG Note.

---

[25] https://x.com/michaelmoro/status/1544733041045786626?s=20;
https://x.com/michaelmoro/status/1544733042849320960?s=20.

118.    In reality, DCG had not ensured that Genesis Global had the capital to operate. In fact, DCG had not given Genesis Global so much as a penny of actual funding to make up for the 3AC losses. Instead, DCG entered into a 10-year promissory note with Genesis Global at an interest rate of 1%—due in 2032. This note was a deceptive accounting gimmick that did nothing to improve Genesis Global's immediate liquidity position or make its balance sheet solvent. As described above, no cash, capital, or assets changed hands from DCG to Genesis Global.

119.    On July 6, 2022, Genesis Global's Head of Communications and Public Relations Marc Yaklofsky sent a document titled "Talking Points to [3AC] Questions" to Moro, as well as Murphy, Cowie, and various other senior employees at Genesis Global and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Global personnel in conversations with counterparties, including with individual investors like Falco.

120.    These talking points did not provide any truthful disclosures regarding the DCG Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Global's losses. Instead, the talking points included the misrepresentations that DCG "absorbed" the losses, that Genesis Global was "well capitalized," and that "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure [Genesis Global] ha[d] more than adequate capital to operate and scale our business for the long-term." These were the same talking points that Genesis Global personnel used when Falco asked whether Genesis Global had any exposure to 3AC.

121.    Senior executives at DCG and Genesis Global were aware that the DCG Note did not fix the threats to Genesis Global's liquidity. On July 7, 2022, Ballensweig described to DCG's

COO, Murphy, that Genesis Global still faced a "structural" liquidity issue "about 1.345B"—"even though DCG took on [the 3AC] liability."

122.    In another communication dated July 22, 2022, Ballensweig explained to a high-level DCG employee that the 3AC losses created a "[d]uration mismatch [at Genesis Global] because we had [one billion] of open term assets with [3AC] which no longer exist and thus cannot be used to offset all of our open term liabilities" including liabilities to the individual investors. Ballensweig continued to explain that there was an additional "asset quality mismatch because $500 [million] of the collateral we absorbed to offset the [3AC] losses was GBTC which isn't liquid. So both of these things on net contribute to the overall net liquidity gap [Genesis Global] [has] as an organization."

123.    DCG's deception about the DCG Note made its way into the lending report that the Genesis Global representative provided to Falco. As noted above, after the collapse of 3AC, Genesis Global's liabilities exceeded its assets by approximately $1.1 billion. Yet, the lending report that was provided to Falco stated that Genesis Global assets *exceeded* its liabilities by $150 million. To come up with that number, Defendants instructed Genesis Global to include the DCG Note in its calculation of Genesis Global's assets and liabilities. As described above, Defendants knew that this was a dishonest way to portray Genesis Global's financial situation, but they did it anyway to induce investors to provide more cryptocurrency in a desperate attempt to keep Genesis Global afloat.

124.    Because the DCG Note was a temporary accounting gimmick that failed to remedy Genesis Global's financial situation in any meaningful way, executives at DCG and Genesis Global understood that they could not lose investors and in fact needed to bring in additional capital from new investors to shore up Genesis Global's liquidity.

125.    For example, in a September 8, 2022 presentation to Silbert and other members of DCG's management team, Genesis Global's CRO wrote that because of the $1.5 billion "[l]iquidity [h]ole" consisting of the DCG Note, and GBTC collateral: "[i]f too many lenders leave, we don't have enough money."

126.    Further, in an October 4, 2022, email, the day before a Genesis Global representative contacted Falco, Genesis Global's CRO directed Genesis Global to begin "[p]lanning in the event of a balance sheet liquidity crunch."

127.    As a result of the impending cash crunch, Genesis Global began reaching out directly to individual investors to solicit new lending arrangements. As detailed above, a Genesis Global representative contacted Falco on October 5, 2022, and based on that representative's false and misleading reassurances about Genesis Global's financial strength, which were based on fraudulent talking points that Defendants distributed to Genesis Global employees, Falco agreed to loan Genesis Global over $60 million worth of bitcoin.

128.    Genesis Global's financial situation did not get any better after Falco made the loan. In an October 20, 2022, email, Silbert summarized for Islim, Murphy, Kraines, and others a "lunch" he had with Gemini President Cameron Winklevoss. During that lunch, Silbert suggested a "closer partnership between Genesis/Gemini/DCG, including a potential merger of the companies." But at the same time, Silbert told Winklevoss "that the path we're on right now could lead to a Genesis bankruptcy." Silbert said that one of the "points [he] made to [Winklevoss]" was that "Genesis has ALWAYS maintained sufficient liquidity for day to day withdrawals, but never planned for a bank run scenario where their largest and most important partner asked for all of the money back immediately."

129.    This email makes clear that Silbert was well aware Genesis Global was on the verge of a catastrophic bank run that would threaten Genesis Global's existence. He privately gave that information to a strategic partner. But he withheld it from Genesis Global's individual investors, while continuing a misinformation campaign—both publicly and through Genesis Global personnel—to portray Genesis Global as a financially stable, "blue chip" leader in the cryptocurrency industry.

130.    Had Falco known at that time that Genesis Global lacked the assets to cover withdrawal requests, he could have protected himself by exercising his rights under the MBA's Event of Default provision to immediately withdrawal the bitcoin he loaned to Genesis Global earlier that month. Instead, laboring under the false pretenses that were disseminated by DCG, Silbert, and Moro, as described above, Falco left his bitcoin with Genesis Global, which he unknowingly thought was a safe and secure place to park his assets during a period of extreme volatility in the broader industry.

131.    Starting on or around November 2, 2022, the cryptocurrency market faced increased volatility due to allegations that cryptocurrency exchange FTX and its sister company Alameda engaged in fraud.

132.    From on or around November 2, 2022, through November 16, 2022, Genesis Global faced increasing volumes of withdrawal requests. Thus, DCG and Genesis Global once again sought to engage in a public communications campaign that misled investors.

133.    For example, on November 11, 2022, DCG drafted a message and authorized Genesis Global to send it to individual investors, including Falco, stating that "the operation of our lending and trading business have not been impacted by recent market events" and that they "will

continue to operate with transparency"—despite the steady diet of lies and misinformation Genesis Global fed investors.



| 11 November 2022 | |
| --- | --- |
| **Deleted Account** | 05:39 |

Good morning @vinniefalco,

I wanted to reach out and highlight an email we've sent through to our client base providing an update on our current balance sheet as we position Genesis for its next phase of growth.

**While the operation of our lending and trading businesses have not been impacted by recent market events, Genesis has taken steps to strengthen its balance sheet with an additional equity infusion of $140M from our parent company, Digital Currency Group.**

This additional capital will bolster our position as a global leader in crypto capital markets and allow us to support our clients and the growing demand for our services.

We will continue to operate with transparency as we always have, and we remain steadfastly committed to all of our clients throughout all market conditions.

Let us know if any questions, happy to chat

*Figure T – Genesis Global's message to Falco on November 11, 2022*

134.    Genesis Global even sent a reference to that message directly to Falco, as seen in *Figure T*. This message encouraged investors to continue financing Genesis Global, and to discourage them from withdrawing their assets from Genesis Global.

135.    As described earlier, if individual investors like Falco were aware of Genesis Global's actual state of practical insolvency, they would be able to terminate their MBAs and demand repayment of the principal and interest owed on the loan.

136.    Indeed, after this message was sent directly to Falco, he responded, "I like infusions." He also asked specifically about Genesis Global's exposure to FTX, as seen in *Figure U.*



*Figure U – Chat between Falco and Genesis Global representative on November 11, 2022*

137.    This message to Falco was misleading in at least two ways. First, Genesis Global did not receive a $140 million "equity infusion"—DCG provided that injection to GGCI, which, as of November 11, 2022, was no longer a subsidiary of Genesis Global. Thus, an equity infusion into GGCI did not benefit investors who provided their assets to Genesis Global.

138.    In fact, Genesis Global's Chief Compliance Officer objected to DCG's COO that the tweet was misleading on this basis, stating: "Non [GGCI] client[s] may derive comfort from an infusion that does not necessarily benefit them."

139.    DCG nevertheless approved Genesis Global to distribute this message to its individual investors.

140.    The second way in which the November 11, 2022, email was misleading was that Genesis Global falsely claimed that the "operation of our lending and trading businesses have not been impacted by recent market events."

141.    In reality, Genesis Global was in the midst of a liquidity crisis. In a November 12, 2022, emergency application for a $750 million to $1 billion loan, Genesis Global admitted that its lending business was facing a liquidity crunch due to an "ongoing demand for liquidity and deposits driven mainly by retail programs and partners of Genesis, (i.e., Gemini Earn) and institutional clients testing liquidity."

142.    This emergency loan application further conceded that Genesis Global faced this "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [3AC]" including (1) the DCG Note; (2) GBTC; and (3) unsecured loans to DCG.

143.    Silbert provided instructions to Genesis Global regarding the preparation of this emergency loan application, reviewed the application, and ultimately sent the application to a proposed lender.

144.    Genesis Global did not—or could not—obtain this emergency loan.

145.    On November 10, 2022, DCGI partially repaid the loan of 18,697 BTC from Genesis Global with 25,999,457 shares of GBTC which were worth approximately $250 million as of November 10, 2022.

146.    This repayment deprived Genesis Global of liquidity because unlike bitcoin, Genesis Global neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due to affiliate sales restrictions.

147.    After this repayment, 4,550.45 BTC (approximately $80 million as of November 10, 2022) remained outstanding on Genesis Global's loan to DCGI. On November 10, 2022, DCG made Genesis Global extend the maturity date for the remaining amount to May 11, 2023. These loans all remain unpaid.

148.    Every statement made to Falco and other investors to induce them to loan assets to Genesis Global, and to keep these assets at Genesis Global, was materially misleading, deceptive, and false. The DCG Note was a sham because the loan was uncollectable, and the economic reality was that Genesis Global was essentially insolvent at the time Defendants DCG and Silbert caused Genesis Global to execute the DCG Note. In a little over a month after Falco was induced to loan his bitcoin to Genesis Global, Genesis Global suspended redemptions, and two months later filed for bankruptcy.

## CAUSES OF ACTION

## COUNT I –Common Law Fraud (Against all Defendants)

149.    Plaintiff realleges the allegations set forth in the above paragraphs.

150.    When 3AC defaulted on billions of dollars of loans owed to Genesis Global, Defendants set out on a massive misinformation campaign designed to hide Genesis Global's decimated financial state and to draw in whatever liquidity they could get from unsuspecting lenders. Plaintiff was one of the many investors that fell victim to this fraudulent scheme.

151.    On June 13, 2022, after 3AC defaulted on billions of dollars in loans owed to DCG subsidiaries, DCG, Silbert, and Moro conspired to create a public misinformation campaign to

conceal the massive losses Genesis Global had suffered and the fact that it was practically insolvent. Defendants' efforts, described extensively above in Section V, included:

a. "[D]rafting internal and external talking points" to coordinate false messaging while keeping the real details of Genesis Global's financial implosion secret.

b. Speaking internally about the situation as creating a potential "bank run" and as "deteriorat[ing] all around" while describing via twitter Genesis Global's supposedly "strong risk management practices and frameworks."

c. Internally stressing the "need to perpetuate" that "Genesis is the 'blue chip' in this mess."

d. Publicly promoting that Genesis Global was operating "as usual" and that Genesis had "shed the risk and moved on," while knowing these statements were false.

e. Engaging in a sham transaction that "could just be for balance sheet support" to make Genesis Global "look[] strong" to draw "additional unsecured funding . . . to manage [Genesis Global's] liquidity."

f. Using this sham transaction to add over a billion dollars of "current" assets to Genesis Global's balance sheet that Genesis Global did not have, so investors would think that Genesis Global was stable.

g. Drafting the "Talking Points to [3AC] Questions" document, which included lies like Genesis Global was "well capitalized" and that "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure [Genesis Global] ha[d] more than adequate capital to operate and scale our business for the long-term" that were used by Genesis Global's representatives.

152.    Defendants' misrepresentations and omissions were materially misleading because Plaintiff either would not have loaned 3,000 BTC to Genesis Global or he would have demanded full repayment of his outstanding loan had he been aware that Genesis Global was functionally insolvent and there was serious risk that Genesis Global would not repay his loan.

153.    Internally, Defendants were aware that this information was all false. For example, on July 7, 2022, Ballensweig described to DCG's COO, Murphy, that Genesis Global still faced a "structural" liquidity issue "about 1.345B"—"even though DCG took on [the 3AC] liability."

154.    In a September 8, 2022 presentation to Silbert and other members of DCG's management team, Genesis Global's CRO wrote that Genesis Global faced a $1.5 billion "[l]iquidity [h]ole." He added that "[i]f too many lenders leave, we don't have enough money."

155.    On October 4, 2022, Genesis Global's CRO directed Genesis Global to begin "[p]lanning in the event of a balance sheet liquidity crunch." Despite this knowledge, Defendants kept up their fraudulent scheme to try and infuse their dying company with whatever assets they could obtain—even though there was no reasonable way the company could survive.

156.    The very next day, on October 5, 2022, a Genesis Global representative contacted Plaintiff about lending bitcoin to Genesis Global. When Plaintiff asked, "What is Genesis' exposure to Three Arrows," the representative followed Defendants fraudulent talking points in responding "we are past the [3]AC situation. We've managed through that with DCG assuming the liability back in June."

157.    When Plaintiff continued his diligence by asking to see Genesis Global's finances, the representative sent over Genesis Global's "lending report." This report included the DCG Note in the "other assets" section—designed by Defendants to falsely reassure investors that Genesis Global was solvent, and that its assets exceeded its liabilities.

158.    Defendants' scheme worked. On October 5, Plaintiff reasonably relied on Defendants' fraudulent misrepresentations and material omissions and he loaned 3,000 BTC to Genesis Global.

159.    As news of the FTX implosion broke, Plaintiff again asked for assurances that Genesis Global was not at risk. A Genesis Global representative again repeated Defendants' talking points and falsely represented that Genesis Global was overcollateralized. The same Genesis Global representative also sent Plaintiff a false lending report representing that Genesis Global was solvent when Defendants in fact knew that the DCG Note was misleadingly and falsely included as an asset on the balance sheet. Without the false and misleading classification of the DCG Note as an asset, the lending report that the Genesis Global representative sent to Plaintiff would have shown that Genesis Global was essentially insolvent at that time.

160.    Plaintiff did not see most of those assets again. His bitcoin was frozen from withdrawal on November 16, 2022, just over one month after he made his loan, along with other lenders to Genesis Global. Plaintiff's assets were ultimately lost in bankruptcy, on January 19, 2023, less than four months after he loaned his bitcoin to Genesis Global.

161.    Plaintiff has only recovered 1,758.54504882 BTC due on the October 2022 loan from the bankruptcy proceeding causing damages of at least 1,241.45495118 BTC, with the exact amount to be determined at trial.

162.    Defendants defrauded thousands of investors, including Plaintiff who has lost at least 1,241.45495118 BTC.  Defendants' conduct was outrageous and motivated by a reckless disregard for Plaintiff's rights, thereby justifying an award of punitive damages.

**COUNT II – Aiding and Aiding and Abetting Fraud (Against all Defendants)**

163.    Plaintiff realleges the allegations set forth in the above paragraphs.

164.    As set forth in detail above, Genesis Global knowingly misrepresented and failed to disclose material facts to Plaintiff that it was practically insolvent following the 3AC bankruptcy. These representations were made with the intention to defraud potential lenders, like Plaintiff, about the reality of Genesis Global's financial situation. Plaintiff reasonably relied on these statements and invested and lost his bitcoin as a result of this fraud.

165.    Defendants knew that Genesis Global was engaged in an ongoing fraud against its lenders, including Plaintiff, by lying about Genesis Global's financial situation after the 3AC collapse beginning in June 2022 to induce its lenders to continue loaning cryptocurrency assets to Genesis Global.

166.    Defendants DCG and Silbert substantially assisted Genesis Global's fraud in many ways, including:

    a.   Leading and advising Genesis Global on how to respond to the 3AC situation.

    b.   Helping to "perpetuate" the notion that Genesis Global was a "blue chip" in the industry at a time of increasing turmoil.

    c.   Publicly spreading the false information that Genesis Global's balance sheet was "strong," "operating normally," and other false information about Genesis Global's finances.

    d.   Helping Genesis Global plan and strategize on how to "fill" the "hole in Genesis equity due to the Three Arrows exposure."

    e.   Carrying out the sham transaction with Genesis Global to falsely pad Genesis Global's balance sheet and hide its real financial situation.

    f.   Drafting and reviewing Genesis Global's public messaging promoting the sham transaction.

g.   Reviewing and approving Genesis Global's "Talking Points to [3AC] Questions," which Genesis Global representatives used when discussing the 3AC default with potential lenders—including Plaintiff.

167.   Defendant Moro was the CEO of Genesis Global and substantially assisted Genesis Global's fraud in many ways including:

a.   Co-leading with DCG and Silbert Genesis Global's response to the 3AC default.

b.   "[D]rafting both internal and external talking points on the [3AC] situation."

c.   Publicly tweeting from his personal twitter account the lies about Genesis Global's financial situation to convince the public that Genesis Global's finances were stable.

d.   Leading the strategy to deceptively show a balance sheet that "look[s] strong" to solve the "liquidity problem" by inducing "people to lend to [Genesis Global] additional" cryptocurrency.

e.   Conceiving of and orchestrating the sham transaction with DCG involving the DCG Note "for balance sheet support" to draw "additional unsecured funding" from lenders like Plaintiff.

f.   Signing the DCG Note on Genesis Global's behalf that allowed Genesis Global to falsely represent on its balance sheet that it had over a billion dollars of liquid assets.

g.   Publicly tweeting the lie that DCG "assumed certain liabilities related to [3AC] to ensure we have the capital to operate" that Genesis Global used to create false comfort for investors like Plaintiff.

168.   As a result of Defendants substantial assistance, Genesis Global was able to successfully defraud Plaintiff by inducing him to loan 3,000 BTC on October 5, 2022, to a failing

company—all because he believed that Gensis Global's financials were stable. His loan was only partially repaid in Genesis Global's bankruptcy proceedings.

169.    Plaintiff has only recovered 1,758.54504882 BTC due on the October 2022 loan from the bankruptcy proceeding causing damages of at least 1,241.45495118 BTC, with the exact amount to be determined at trial.

170.    Defendants substantially aided the defrauding of thousands of investors, including Plaintiff who has lost at least 1,241.45495118 BTC. Defendants' conduct was outrageous and motivated by a reckless disregard for Plaintiff's rights, thereby justifying an award of punitive damages.

### COUNT III – Conspiracy to Commit Fraud (Against all Defendants)

171.    Plaintiff realleges the allegations set forth in the above paragraphs.

172.    Defendants agreed and conspired with Genesis Global to commit fraud against Plaintiff and other lenders.

173.    In furtherance of this conspiracy Defendants committed overt acts—identified in detail above—including publicly tweeting false information about Genesis Global's financial health, drafting false talking points used in discussions with lenders about the 3AC default, and signing the DCG note to falsely pad Genesis Global's balance sheet for investors.

174.     Plaintiff was harmed as a result of this conspiracy, when he loaned 3,000 BTC to Genesis Global, after relying on Genesis Global's representative's fraudulent information about the company's financial health. Genesis Global was in fact in serious financial trouble.

175.    Plaintiff has only recovered 1,758.54504882 BTC due on the October 2022 loan from the bankruptcy proceeding causing damages of at least 1,241.45495118 BTC, with the exact amount to be determined at trial.

176. Defendants conspired to defraud thousands of investors, including Plaintiff who has lost at least 1,241.45495118 BTC. Defendants' conduct was outrageous and motivated by a reckless disregard for Plaintiff's rights, thereby justifying an award of punitive damages..

**COUNT IV – New York Tortious Interference with Contract (Against all Defendants)**

177. Plaintiff realleges the allegations set forth in the above paragraphs.

178. On February 9, 2021, Plaintiff signed the MBA with Genesis Global, and this contract was in effect from the date it was signed through at least the date Genesis Global defaulted and filed for bankruptcy in 2023.

179. Section VI(e) and (f) of the MBA bound Genesis Global to the ongoing Solvency Warranty and Adverse Proceeding Warranty, which represented that Genesis Global was solvent and that there were no proceedings that could have adverse effects on the MBA.

180. Defendants were aware of Genesis Global's contractual requirements and that thousands of investors, including Plaintiff, had entered into such contracts with Gensis Global.

181. Nonetheless, beginning on June 13, 2022, when 3AC defaulted on its loans from Genesis Asia, Defendants intentionally instructed and tortiously caused Genesis Global to breach its contractual obligations by publicly promoting a lie about Genesis Global's solvency and fraudulently representing that it was not affected by the 3AC default and bankruptcy proceedings.

182. Defendants also engaged in a sham transaction with Genesis Global to bolster this lie, so that Genesis Global could support its continued false representations—and contractual breaches—that it was solvent and was not affected by the 3AC proceedings on its balance sheet.

183. Genesis Global's MBA with Plaintiff required it to make a continued representation of solvency and a lack of adverse proceedings. Defendants fraudulently caused Genesis Global to breach the MBA by hiding the fact that the company was essentially insolvent and that the 3AC liquidation threatened adverse effects on the loans contemplated by the MBA.

184.    Defendants tortiously induced Genesis Global to make these contractual breaches to hide from Plaintiff, and other investors, that the company was still practically insolvent.

185.    Defendants' fraudulent actions caused Plaintiff significant harm, as their material omissions and false representations about Genesis Global's financial situation—in breach of the contract—caused Plaintiff to loan 3,000 BTC to Genesis Global unaware that he was handing over his assets to an essentially insolvent company.

186.    Had Defendants not induced Genesis Global to carry out this lie, Plaintiff would have never lent his money to Genesis Global and would have never lost his assets when the company went bankrupt. Moreover, absent Defendants' fraudulent statements and misrepresentations, Plaintiff would have been aware that Genesis Global was practically insolvent—triggering an Event of Default—and thus would have had the contractual right to demand immediate repayment of the principal and interest owed to him by Genesis Global.

187.    Defendants also tortiously induced Genesis Global to hide its breach of the Solvency Warranty and Adverse Proceedings Warranty, and thereby interfere with Plaintiff's contractual relationship with Genesis Global, by providing false and misleading information to Genesis Global representatives to provide to investors like Plaintiff. A Genesis Global representative in fact repeated Defendants' talking points and falsely represented that Genesis Global was overcollateralized. The same Genesis Global representative also sent Plaintiff a false lending report representing that Genesis Global was solvent when Defendants in fact knew that the DCG Note was misleadingly and falsely included as an asset on the Genesis Global balance sheet. Without the false and misleading classification of the DCG Note as an asset, the lending report that the Genesis Global representative sent to Plaintiff would have shown that Genesis Global was essentially insolvent at that time.

188.    On November 11, Defendants further tortiously induced Genesis Global to breach its contractual obligations again by drafting an email containing false statements and causing Genesis Global to send the email to its lenders, including Plaintiffs. The message stated that "the operation of our [Genesis Global] lending and trading business have not been impacted by recent market events."

189.    This message continued the ongoing lie, as Genesis Global was in the midst of a liquidity crisis that prompted them—on the very next day—to file an emergency application for a $750 million to $1 billion loan.

190.    Defendants knew about this liquidity crisis, yet they had Genesis Global falsely represent that everything was fine, in direct breach of the contract that mandated Genesis Global to update lenders if its representations were no longer valid.

191.    By doing so, Plaintiff was unable to remove his cryptocurrency from a failing entity, directly causing him losses of at least 1,241.45495118 BTC, with the exact amount to be determined at trial.

192.    Defendants tortiously interfered with and damaged thousands of investors, including Plaintiff who has lost at least 1,241.45495118 BTC.    Defendants' conduct was outrageous and motivated by a reckless disregard for Plaintiff's rights, thereby justifying an award of punitive damages..

**COUNT V – Violation of  New York General Business Law § 349 (Against all Defendants)**

193.    Plaintiff realleges the allegations set forth in the above paragraphs.

194.    Defendants' acts and practices alleged herein constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material

facts with the intent that others rely upon such concealment, suppression, or omission, in violation of all state statutes making deceptive and unfair acts and practices illegal.

195.    Defendants' conduct is deceptive because their material misrepresentations and omissions were likely to mislead their investors.

196.    Plaintiff is a victim of Defendants' deceptive practices, as Plaintiff received marketing materials, contracts, communications, assurances, and other information from Defendants, or otherwise, drafted, created, or approved by Defendants, regarding Genesis Global's solvency and relied on the statements contained therein when making financial decisions, including making the loan described herein.

197.    Defendants' deceptive practices violated New York General Business Law § 349 and as a result Plaintiff has suffered a loss of at least 1,241.45495118 BTC in damages, with the exact amount to be determined at trial.

## COUNT VI – Violation of The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (Against all Defendants)

198.    Plaintiff realleges the allegations set forth in the above paragraphs.

199.    Defendants' acts and practices alleged herein constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of all state statutes making deceptive and unfair acts and practices illegal.

200.    Defendants' conduct is deceptive because their material misrepresentations and omissions were likely to mislead their investors.

201.    Plaintiff is a victim of Defendants' deceptive practices, as Plaintiff received marketing materials, contracts, communications, assurances, and other information from

Defendants, or otherwise, drafted, created, or approved by Defendants, regarding Genesis Global's solvency and relied on the statements contained therein when making financial decisions, including making the loan described herein.

202.    Defendants' deceptive practices violated The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. and as a result Plaintiff has suffered a loss of at least 1,241.45495118 BTC in damages, with the exact amount to be determined at trial.

### COUNT VII – Violation of The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq. (Against all Defendants)

203.    Plaintiff realleges the allegations set forth in the above paragraphs.

204.    Defendants' acts and practices alleged herein constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of all state statutes making deceptive and unfair acts and practices illegal.

205.    Defendants' conduct is deceptive because their material misrepresentations and omissions were likely to mislead their investors.

206.    Plaintiff is a victim of Defendants' deceptive practices, as Plaintiff received marketing materials, contracts, communications, assurances, and other information from Defendants, or otherwise, drafted, created, or approved by Defendants, regarding Genesis Global's solvency and relied on the statements contained therein when making financial decisions, including making the loan described herein.

207.    Defendants' deceptive practices violated The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq and as a result Plaintiff has suffered a loss of at least 1,241.45495118 BTC in damages, with the exact amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief against Defendants:

a.  Enter judgment in favor of Falco and against Defendants for actual and compensatory damages in BTC in an amount sufficient to compensate Falco for the damages suffered as a consequence of Defendants' fraud, in an amount to be determined at trial but not less than 1,241.45495118 BTC.

b.  Enter judgment in favor of Falco and against Defendants for actual and compensatory damages in BTC in an amount sufficient to compensate Falco for the damages suffered as a consequence of Defendants' aiding and abetting fraud, in an amount to be determined at trial but not less than 1,241.45495118 BTC.

c.  Enter judgment in favor of Falco and against Defendants for actual and compensatory damages in BTC in an amount sufficient to compensate Falco for the damages suffered as a consequence of Defendants' tortious interference with contract, in an amount to be proven at trial but not less than 1,241.45495118 BTC.

d.  Enter judgment in favor of Falco and against Defendants for the bitcoin he lost as a consequence of Defendants' violation of state consumer protection laws, in an amount to be determined at trial, but not less than 1,241.45495118 BTC.

e.  Enter judgment in favor of Falco and against Defendants for punitive and exemplary damages to the fullest extent permitted by law.

f.  Enter judgment in favor of Falco for pre-judgment and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law.

g.  Enter judgment in favor of Falco for costs of suit incurred herein, including reasonable attorneys' fees, costs, and other expenses incurred in this action.

h.  Such other relief as this Court may deem just and proper.

Dated: New York, New York
      May 6, 2025

**MCDERMOTT WILL & EMERY LLP**

*/s/ Alexander H. Southwell*

Joseph B. Evans
Alexander H. Southwell
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: jbevans@mwe.com
       asouthwell@mwe.com

*Counsel to Vincent Falco*